UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| KNOXVILLE TVA EMPLOYEES CREDIT UNION,<br><br>Plaintiff/Appellant,<br><br>v.<br><br>NICHOLAS VAUGHN MORRIS,<br><br>Defendant/Appellee. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 2:25-CV-00221-DCLC-CRW |

---

| | | |
|---|---|---|
| IN RE: NICHOLAS VAUGHN MORRIS<br><br>Debtor. | )<br>)<br>) | Bankr. Case No. 2:25-BK-50475-RRM |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on appeal from the United States Bankruptcy Court of the Eastern District of Tennessee. Appellant Knoxville TVA Employees Credit Union appeals the Bankruptcy Court's December 11, 2025 Order finding the fair market value of Appellee/Debtor Nicholas Vaughn Morris's residence to be $200,000. Nicholas Vaughn Morris owns a house in Kingsport, Tennessee. Termites have damaged its walls and doorframes, and water has seeped through its foundation into a finished basement. What the house is worth determines how much of a $17,477.92 judgment lien Morris may avoid in his Chapter 7 case. The Bankruptcy Court adopted the Credit Union's appraiser's value of $240,000, applied a $20,000 cost-to-cure adjustment for the termite damage, and applied a second $20,000 adjustment for water damage that the appraiser did not observe. The Credit Union argues that the second $20,000 adjustment was clear error. Because the Bankruptcy Court based its valuation from the appraiser's own figures

and from the testimony of two individuals who live in the house, the Bankruptcy Court's valuation is not clearly erroneous. Accordingly, the Court will **AFFIRM** the Bankruptcy Court's Order.

## I. BACKGROUND

On October 9, 2024, Knoxville TVA Employees Credit Union ("Credit Union") initiated an action in Sullivan County General Sessions Court against Nicholas Vaughn Morris ("Debtor") and Courtney Hart. An agreed judgment resolving this action was entered on December 6, 2024, awarding judgment for the Credit Union in the amount of $17,477.92. This judgment was recorded as a lien with the Sullivan County Register of Deeds and encumbered Debtor's property located in Kingsport, Tennessee.

On April 29, 2025, Debtor initiated a Chapter 7 case in the Bankruptcy Court for the Eastern District of Tennessee. He moved to avoid the judicial lien pursuant to 11 U.S.C. § 522(f)(1)(A). This section of the Bankruptcy Code provides that a debtor may avoid the fixing of a judicial lien on his property interest to the extent that such lien impairs an exemption to which the debtor would have been entitled. In this case, Debtor is entitled to a homestead exemption for his property and the parties agreed to calculate the extent of an impairment of this exemption

> by first assuming that the value of the debtor's interest in the property is one-half of the market value of the property, and then subtracting from that one-half value both the debtor's $35,000 homestead exemption and one-half of the $114,123 loan balance secured by the deed of trust, or $57,061.50. Thus, per the parties' agreed calculation, the impairment of the debtor's homestead exemption will be calculated by subtracting $92,061.50 from one-half of the property's market value.

[Doc. 3-6, pgs. 9-10].

The parties' agreed calculation assumes that the Debtor holds a one-half interest in the property, so every dollar of market value adds fifty cents to his share of the property. Deducting the $35,000 homestead exemption and Debtor's $57,061.50 share of the deed of trust leaves him $7,938.50 in equity at the Bankruptcy Court's $200,000 valuation and $17,938.50 at the $220,000

valuation the Credit Union argues is the appropriate valuation. The judicial lien is $17,477.92. At $200,000, the lien exceeds the available equity by $9,539.42 and is avoided to that extent. But at $220,000, the equity covers the lien and none of it is avoided. The $20,000 in dispute is thus the difference between avoiding more than half the lien and avoiding none of it.

The Bankruptcy Court held a hearing on the motion on December 11, 2025, with the sole evidentiary issue being the market value of Debtor's property. The Bankruptcy Court heard testimony on the issue from the two homeowners, Debtor and Hart, and from the Credit Union's expert residential appraiser, Justin Briggs. Briggs did not visit the property. Curtis Bowen conducted the site inspection, and Bowen did not testify. Admitted into evidence were pictures of the property, the Curriculum Vitae of Briggs, and the Appraisal Report prepared by Briggs.[1]

Each of the witnesses testified about two issues with the property that led to their disparate property valuations and that are central to this appeal: termite damage and water damage. Both the homeowners and Briggs agreed that there was evidence of termite damage to the home. Debtor testified that he discovered a termite infestation about a year after purchasing the property, that he repaired termite-damaged walls and doorframes, and that he paid for a Terminix technician to spray termiticide, but that he could not afford the full treatment recommended by the technician. [Doc. 3-6, pgs. 3-4]. Briggs testified that "[I]t was observed that there's what appears to be termite damage throughout the home. That damage appears to be quite significant … we did have to address that the best we could and in this case utilized a cost-to-cure adjustment." [*Id.* at pg. 6]. In this situation, Briggs described a cost-to-cure as:

> overall an estimate to, to help with kind of just looking at the overall marketability of the subject property and what it would bring on the open market. We need to do a cost to cure to keep it in line with market expectations and to value it accordingly

---

[1] Briggs relied on the observations of Curtis Bowen, "the sole individual performing the appraisal site visit." [Doc. 3-6, pg. 5].

> to what we think someone would pay for the home because of its deferred maintenance in this case. Deferred maintenance just meaning any condition that would require repair, which in this case would be that termite damage.

[*Id.*]. Therefore, to adequately account for any change in the property's value due to the observed termite damage, Briggs applied a $20,000 cost-to-cure adjustment. His expert report describes the same approach. [*Id.* ("This appraisal is developed under the extraordinary assumption that the damage observed in the subject's basement is the result of an extensive termite infestation. The estimated cost to cure this condition is approximately $20,000.")]. Briggs also testified that he maintains a database of cost-to-cure estimates for individual defects, including mold, termites, and water intrusion, and that each such defect carries an estimated cost to cure of approximately $20,000. [Doc. 3-6, pgs. 8-9].

The witnesses' testimony about the property diverged when discussing possible water damage. Debtor testified that around nine months after purchasing the home in March 2020, "flooding started happening … It was leaching through the foundation of the house due to not having any moisture barrier, coming through my storage room. And all six rooms downstairs in a fully furnished basement had standing ankle-high water overnight." [Doc. 3-6, pg. 3]. He added that the basement flooded five more times before he installed a French drain to divert water away from the home. Though flooding has not occurred since this installation, Debtor testified that the basement remains damp from water seepage, and that he runs a dehumidifier that removes a gallon-and-a-half to two gallons of water each week. Debtor also explained that the flooding had damaged the sheetrock in his basement and that he will need to remove and replace the sheetrock in all the rooms downstairs to remove the resulting mold. He also testified that a better remedy to alleviate the flooding exists, but he cannot afford that solution. Debtor's knowledge of flooding remediation comes from his personal experience with "remodeling and renovation and home building … for eight years solid, and three years after that fact, off and on." [*Id.* at 3].

Hart corroborated Debtor's testimony and added that there is visible staining on the basement sheetrock from the flooding. She also noted that they use moisture absorbers in addition to the dehumidifier to help with the dampness problem.

Briggs, on the other hand, did not explicitly find water damage in the property. When asked whether he considered anything other than termite damage, he responded:

> Anytime we see termite damage, we are assuming that there's some potential moisture issues and/or that there have in the past been some moisture issues. Termites typically, and I'm not an expert, but from what experts have told me termites typically follow water. So if we're seeing visible signs of termites like exhibited in these photos, we can assume there's some moisture issues. Now that could be as small as, you know, fixing guttering and putting a dehumidifier in a basement. It could be as large as exterior renovation excavation. It could, could get extensive. It's just hard to know.

[*Id.* at 8]. He also noted that he "didn't observe potential mold" but that "the possibility of some water intrusion and/or moisture issues were taken into consideration" along with the termite damage. [*Id.*].

Ultimately, Debtor testified that his opinion of the property's market value was "close[] to" $160,000. [*Id.* at 4]. Hart said that she would assess it at $185,000. [*Id.* at 5]. Briggs arrived at a property value of $220,000 by calculation: first, he used a direct sales comparison of three other properties, made various adjustments and applied a weighted average to get a starting value of $240,000; then he applied a negative $20,000 "cost to cure" adjustment for the termite infestation.

The Bankruptcy Court issued its oral ruling at the end of the hearing, with a written Order entered the same day finding the property value to be $200,000. To reach this value, the Bankruptcy Court started with Briggs's starting $240,000 value. It then applied Briggs's same $20,000 cost-to-cure adjustment for termite damage. And then it applied a final $20,000 cost-to-cure adjustment to address the water damage that it found Briggs did not fully consider in his

valuation. The Credit Union timely filed its Notice of Appeal on December 23, 2025, and the Bankruptcy Court issued a Memorandum Opinion on February 17, 2026, memorializing the findings it announced from the bench.

## II. LEGAL STANDARD

This court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158. In an appeal from a bankruptcy court decision, the district court reviews the bankruptcy court's conclusions of law de novo, and its findings of fact for clear error. *Am. Bank, N.A. v. Meoli* (*In re Wells*), 561 F.3d 633, 634 (6th Cir. 2009); *In re Rembert*, 141 F.3d 277, 280 (6th Cir. 1998). Under these standards, the district court must accept the factual determinations of the bankruptcy court unless it is "left with the definite and firm conviction that a mistake has been committed." *In re HNRC Dissolution Co.*, 3 F.4th 912, 923 (6th Cir. 2021) (quoting *In re Burke*, 863 F.3d 521, 528 (6th Cir. 2017)). And when the "trial judge's is based on [her] decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Holt v. City of Battle Creek*, 925 F.3d 905, 910–11 (6th Cir. 2019) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985)).

The value of property is a question of fact. A fair market value calculation is "'more art than science,' and a variety of factors are to be considered," including "appraisals of property, witness testimony, offers made for the property in question, and comparable arm's length sales, with no single factor being dispositive." *Midstate Fin. Co. v. Peoples*, 587 B.R. 685, 692 (E.D. Tenn. 2018) (quotation and citation omitted). When a court is presented with appraisal evidence, it may consider "the appraiser's education, training, experience, familiarity with the subject of the appraisal, manner of conducting the appraisal, testimony on direct examination, testimony on cross

examination, and overall ability to substantiate the basis for the valuation presented." *Id*. (quoting *In re Buckland*, 123 B.R. 573, 578 (Bankr. S.D. Ohio 1991)). And a court need not accept an appraiser's calculations. It may "form its own opinion" from the evidence before it. *Id*. (quoting *In re Holcomb Health Care Servs., LLC*, 329 B.R. 622, 669 (Bankr. M.D. Tenn. 2004)).

## III. ANALYSIS

On appeal, the Credit Union argues that the Bankruptcy Court abused its discretion by giving greater weight to the Debtor's witnesses than to its expert appraiser and that the Bankruptcy Court committed clear error by valuing the property $20,000 below the appraiser's value. Both arguments challenge the Bankruptcy Court's finding of fact about the value of the residence. The Bankruptcy Court weighed the admitted testimony and made a specific factual finding about the value of the residence. This Court reviews that finding for clear error.

### A. The Bankruptcy Court's Evaluation of the Testimony

The Bankruptcy Court credited the homeowners on the condition of the residence and the appraiser on its value. The Debtor and Hart had lived in the house for years and were the only witnesses with firsthand knowledge of its condition. Briggs never visited the property. He could not testify that the basement had flooded six times, that the sheetrock was stained and moldy, or that a dehumidifier pulled two gallons of water from the air each week. Debtor and Hart could, and the Bankruptcy Court credited their testimony. It found that they "were far more knowledgeable of the defects in the residence, testifying not only to the termite infestation but to problems with water intrusion and mold that were unnoticed and unaccounted for by Mr. Briggs and his team and that would have had an impact on the property's appraised value had they been observed." [Doc. 3-6, pg. 11]. The Credit Union offered no witness who had inspected the


Case 2:25-cv-00221-DCLC-CRW Document 7 Filed 08/26/26 Page 7 of 10 PageID #: 63

basement and contradicted the testimony of the Debtor and Hart. Thus, the Bankruptcy Court's finding that their testimony was credible is supported by the record.

The Credit Union's real objection focuses on double counting. Briggs testified that termite damage implies moisture: "Anytime we see termite damage, we are assuming that there's some potential moisture issues." [Doc. 3-6, pg. 8]. With that premise, the first $20,000 adjustment already accounted for the water issue, and the second reduction of $20,000 charged the Credit Union twice for a single defect.

The record forecloses that conclusion. Briggs's report states that the appraisal "is developed under the extraordinary assumption that the damage observed in the subject's basement is the result of an extensive termite infestation. The estimated cost to cure *this condition* is approximately $20,000." [Doc. 3-6, pg. 6 (emphasis added)]. The condition is not water damage, it is termite damage. The report does not even reference any water damage at all. [Doc. 4, pg. 15]. And Briggs testified that he maintains separate cost-to-cure estimates for mold, termites, and water intrusion, each of roughly $20,000. [Doc. 3-6, pgs. 8-9]. By his own testimony, the three defects carry separate costs. Assuming termites travel with moisture is not an adjustment for a basement that has flooded six times and still requires a dehumidifier. It was not clear error for the Bankruptcy Court to find that Briggs accounted for the first condition and not the second.

**B. The Bankruptcy Court's Valuation of the Property**

As to the value of the property, the Bankruptcy Court only considered the expert appraiser's numbers. In both the Bankruptcy Court's oral ruling and written memorandum opinion, it noted the significant weight it afforded to the expert appraiser's testimony. [*Id.* at 10 ("The court assigned significant weight to Mr. Briggs' appraisal because of his background, his familiarity with the East Tennessee real estate market, and the methodology used to appraise the home.")].

But, in fact, the Bankruptcy Court *solely* relied on Briggs' provided values to calculate the property's market value. The Bankruptcy Court started with the expert's appraisal value but because it found that he did not fully consider the water damage to the home, the Bankruptcy Court consequently reduced the property value by the appraiser's own general cost-to-cure value. [*Id.* at 12 ("Mr. Briggs' testimony acknowledged that separate problems with mold, termites, and water intrusion may each reduce the market value of a property by an estimated cost to cure of '15 around $20,000 because there's so many unknowns.'")]. The Bankruptcy Court did not give any weight to the homeowners' testimony on the property value, and it did not abuse its discretion in doing so.

Finally, given the discretion afforded bankruptcy courts in evaluating fair market values, the Court cannot say the Bankruptcy Court's valuation was clearly erroneous. The Bankruptcy Court properly considered the full range of evidence before it, including the testimony of Debtor, Hart, and Briggs, and it considered Briggs' experience and familiarity with the subject property. Ultimately, his lack of familiarity with the property caused the Bankruptcy Court to conclude that his appraisal did not fully incorporate the water damage's negative effect on the property value. [Doc. 3-6, pg. 12 ("because Mr. Briggs had no knowledge of the problems in the residence related to water intrusion and mold, he could not have included a cost to cure estimate for each of them—standard or otherwise—in his appraisal report.")]. This approach was not clearly erroneous.

## IV. CONCLUSION

The Bankruptcy Court did not commit clear error in valuing Debtor's residence at $200,000. Accordingly, the Bankruptcy Court's Order is **AFFIRMED.** This is a final order, and the Clerk is **DIRECTED** to close this case.

**SO ORDERED:**

s/ Clifton L. Corker
United States District Judge